UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DAVID JOSEPH, ROBERT MACIASZ,
ANTHONY MANDERACHIA,
DENNIS SOKOLA, EDWARD TUTTLE,
and WILLIE E. WORTHEN,
individual Michigan citizens,**

       **Plaintiffs,**

**v.**

Case No.  06-10274

**HONORABLE DENISE PAGE HOOD**

**FORD MOTOR COMPANY, a Michigan
domestic profit corporation,**

       **Defendant.**

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.  INTRODUCTION**

This matter is before the Court on Defendant Ford Motor Company's Motion for Summary Judgment **[Docket No. 105, filed Oct. 24, 2008]**. On November 21, 2008, the Plaintiffs filed a Response **[Docket No. 123]**, to which Defendant Ford filed a Reply **[Docket No. 139, filed Dec. 10, 2008]**. A motion hearing was held on February 23, 2009.

**II.  STATEMENT OF FACTS**

Plaintiffs David Joseph, Robert Maciasz, Anthony Manderachia, Dennis Szokola, Edward Tuttle and Willie E. Worthen are current employees of Severstal Corporation at the Rouge Steel facility. Plaintiffs were hired by Defendant Ford Motor Company ("Ford") between 1971 and 1973. (Compl. ¶ 9). Plaintiffs allege that their retirement plan benefits are "in

jeopardy" as a result of the Rouge Steel bankruptcy and asset sale to the Severstal Corporation. (Compl. ¶ 3).

Plaintiffs were each Ford hourly employees and United Auto Workers Local Union No. 600 ("UAW") members from their time of hire until 1989 when Ford sold Rouge Steel to the Marico Acquisition Corporation ("Marico"). Plaintiffs allege that, at the time of the sale, they opted to continue employment at Rouge Steel with the benefit of certain promises and assurances made by Ford to Plaintiffs both individually and collectively as members of UAW. (Compl. ¶ 15). Plaintiffs continued to be UAW members until 1992 or later. Between 1992 and 2000, each Plaintiff changed from hourly UAW positions to salaried positions at Rouge Steel. (Compl. ¶ 17). In 2003, Rouge Steel declared bankruptcy and Severstal Corporation bought the company assets, but "only if it was without liability to the four Rouge Steel pension plans, including Plaintiffs' pension plan." (Compl. ¶ 19).

Plaintiffs contend that as hourly employees at the time of the 1989 Marico sale, each retained rights pursuant to a November 28, 1989 Settlement Agreement between Ford and the UAW through the time of the Rouge Steel asset purchase by Severstal. (Compl. ¶ 22). Plaintiffs maintain that pursuant to Attachment 9-Letter Regarding the Long Term Security of the Rouge Steel Work Force ("Letter No. 9") to the Ford-UAW settlement agreement, UAW members were promised an opportunity to return to Ford in the event of a future sale of Rouge Steel assets. (Pls.' Resp. at 2, Ex. A). Plaintiffs assert that the promises in Letter No. 9 were to "remain in effect for an employee for a period of time equal to his Ford seniority as of the date of the sale, or for a ten year period following the date of sale, whichever is greater." *Id.* Further, Plaintiffs argue that since each Plaintiff was an hourly employee and had at least 16 years of seniority as of

2

the date of sale, rights vested at the time of the 1989 sale, and therefore Plaintiffs retained rights under Letter No. 9 as of February, 2004. (*Id.* at 3).

Plaintiffs contend that the promise of Letter No. 9 was also incorporated by reference in the Marico Rouge Steel Retention Payment Program Applications ("Retention Payment Application"). (Compl. ¶ 27). The Retention Payment Application states,

> [e]mployees who accept provisions of the retention plan are accepting employment with Marico Rouge Steel and shall have continuous seniority with Marico Rouge Steel Company. Such employees will have only Rouge Steel Company seniority and will have waived all seniority rights with Ford Motor Company, except those which have been agreed to by the parties as described in Letter No. 9.

(*Id.*, Ex. B). Plaintiffs argue that the "applications" are individual contracts between each of the Plaintiffs and Ford. Plaintiffs assert that, beginning in 2003, they sought to return to hourly UAW membership and/or to exercise their contractual rights under Letter No. 9, however, they have been prevented from doing so "through Defendant's negotiations with the UAW, false and misleading representations by and through Ford, and by Ford's outright refusal to honor contractual obligations." (*Id.*).

Plaintiffs' Third Amended Complaint alleges: (1) breach of the collective bargaining agreement, in violation of § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (LMRA); and (2) interference with benefits, in violation of § 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140.

### III. STANDARD OF REVIEW

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require

3

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.*

**IV.    ANALYSIS**

In Defendant's Motion for Summary Judgment, Defendant contends that it is entitled to summary judgment on both Plaintiffs' § 301 and § 510 claims. For the reasons detailed below, the Court concludes that Defendant is not entitled to summary judgment on either claim.

      A.    <u>Section 301 of the Labor Management Relations Act</u>

Plaintiffs allege that, in refusing to honor their request to exercise certain rights under Letter No. 9, Ford has breached the CBA and violated § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Ford argues that it is entitled to summary judgment on Plaintiffs' § 301 claim because: (1) Plaintiffs are not third-party beneficiaries entitled to enforce Letter No. 9; and (2) even if they were, Ford did not breach Letter No. 9 given that it was extinguished by the subsequent Memorandum of Agreement, and its terms were never triggered as no layoff ever occurred. In opposition, Plaintiffs maintain that they have an actionable right under § 301 in order to enforce the terms of Letter No. 9 as third party beneficiaries. Further, Plaintiffs contend that the provisions of Letter No. 9, which arguably provide them with certain vested rights, were triggered when Plaintiffs were laid off on January 29, 2004.

1.  *Third-Party Beneficiary Status*

"Although § 301 contemplates suits between unions and employers for breaches of collective bargaining agreements, it also permits individual employees to sue as third-party beneficiaries of collective bargaining agreements." *United Food & Commercial Workers Local 951 v. Mulder*, 31 F.3d 365, 370 (6th Cir. 1994)(citing *Smith v. Evening News Ass'n.*, 371 U.S. 195, 200, 9 L. Ed. 2d 246, 83 S. Ct. 267 (1962)). While it is true that the most common kind of Section 301 cases are of the so-called "hybrid" variety – in which employees sue both their union (for breach of the duty of fair representation), and their employer (for breach of a collective bargaining agreement) – fair representation suits are not inextricably linked to Section 301 suits against employers. *Anderson v. AT&T*, 147 F.3d 467, 473 (6th Cir. 1998). The Sixth Circuit Court of Appeals has recognized that "the plaintiff can recover for the employer's breach of a collective bargaining agreement if the plaintiff is a third-party beneficiary of the

5

agreement." *Id.* (citing *United Food & Commercial Workers Local 951 v. Mulder*, 31 F.3d 365, 370 (6th Cir. 1994)).

For the purposes of the instant motion, both parties concede that the Plaintiffs are not signatories to the contract, i.e. the union or employer, however, there is considerable debate as to whether the Plaintiffs are considered third party beneficiaries. Ford asserts that the Plaintiffs cannot be considered third-party beneficiaries, and as a result are not entitled to enforce Letter No. 9 under § 301. When making this preliminary determination, this Sixth Circuit has recognized that "common-law formalities of third-party beneficiary contracts do not apply in the LMRA context, and that a promise in a collective bargaining agreement to pay certain wages to employees makes those employees third-party beneficiaries of the agreement for purposes of Section 301." *Anderson*, 147 F.3d at 473. When certain rights such as wages and pension guarantees are "applicable to specific, identifiable employees, they may be asserted by those individual employees as third-party beneficiaries of the agreement." *Id.* at 474.

Viewing the facts in a light most favorable to the non-movant, this Court is persuaded that Letter No. 9 embraces the Plaintiffs as third-party beneficiaries. Letter No. 9, which has its genesis in Marico's acquisition of Rouge Steel from Ford, most assuredly contemplated the Plaintiffs as third party beneficiaries. In fact, Letter No. 9 could be read to include the Plaintiffs in the description of individuals who are eligible to return to work for Ford Motor Company in the case of a lay-off:

> Ford Motor Company is willing to allow any Marico Rouge Steel employee who has seniority as of the date of sale and who may be laid-off in the future as a result of a layoff of unknown duration, a permanent discontinuance of an operation at Marico Rouge Steel or a sale of the assets of the company, will be afforded the opportunity at the time of layoff to exercise seniority at Ford Rouge area plants.

[Letter No. 9, November 28, 1989, Def.'s Mot. for Summ. J., Ex. B]. In support of this contention, Plaintiffs assert that at all relevant times they were Rouge Steel employees who had seniority on the date of the sale. Additionally, Plaintiffs proffer the deposition testimony of Jack Hall (Ford's Executive Director of Labor Relations and Employee Development) a drafter of Letter No. 9, who arguably admitted that beyond the lay-off requirement, Plaintiffs satisfied the prerequisites to exercise the rehire option. [Deposition of Jack Hall, p.88, Pls.' Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), Ex. A]. Letter No. 9, a portion of the CBA, identifies specific employees – those with seniority at the date of the sale – of which Plaintiffs, for purposes of summary judgment, could be considered. *See Groves v. Ring Screw Works*, 498 U.S. 168, 173, 111 S. Ct. 498, 112 L. Ed. 2d 508 (1990) ("Section 301 contemplates suits by and against individual employees as well as between unions and employers; and contrary to earlier indications § 301 suits encompass those seeking to vindicate 'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge.") Indeed, while there remains considerable debate as to whether the Plaintiffs fall within the class of individuals who are eligible to return to Ford, this Court is persuaded that they are, for the purposes of summary judgment, third-party beneficiaries to Letter No. 9.

        2.    *Letter No. 9*

Beyond challenging Plaintiffs' standing as third-party beneficiaries, Ford also argues that Letter No. 9 is not actionable because: (1) Letter No. 9 was extinguished by a subsequent collective bargaining agreement between the UAW and Ford; and (2) Letter No. 9 was never breached. In support of its initial theory, Ford relies on the February 23, 2004 Memorandum Agreement ("2004 Agreement") between Ford and the UAW, which in pertinent part provides,

"[t]he Parties also agree that Letter No. 9 will have no further force and effect as to any rights of the Rouge Steel Workforce against Ford and that no employment actions of Severstal will trigger any obligations of Ford to the Steel Workforce under Letter No. 9." [February 23, 2004 Memorandum Agreement, Def.'s Mot. for Summ. J., Ex. N]. The relevant parties to this agreement are broadly defined as, Ford and the UAW "on behalf of its current and former members that were at any time employed as hourly employees by Rouge Steel Company, Rouge Industries, Inc., Marico ... or any of their affiliates or successors, ... or Severstal." According to Ford, the 2004 Agreement permitted Severstal hourly employees, who met certain eligibility requirements, to return to work at Ford:

> The Parties have decided it is in their mutual best interests to make certain opportunities available to the Rouge Steel Workforce who meet certain eligibility criteria and who under the terms of the Ford-UAW Letter No.9 ... had return to Ford rights as of January 29, 2004 in an effort to resolve all issues between the UAW and Ford arising from the interpretation and application of Letter No. 9 as a result of the bankruptcy of Rouge. ... The Parties also agree that Letter No. 9 will have no further force and effect as to any rights of the Rouge Steel Workforce against Ford and that no employment actions of Severstal will trigger any obligations of Ford to the Rouge Steel Workforce under Letter No. 9.

[*Id*]. Based on this contract language, Defendant contends that Plaintiffs cannot seek to enforce their rights under Letter No. 9. In opposition, Plaintiffs argue that the 2004 Agreement is only applicable to current union membership, and had no effect on the Plaintiffs. Further, Plaintiffs posit that Letter No. 9 created a "status benefit," precluding Ford and the UAW from later contracting the benefit away. Viewing all facts in the light most favorable to the Plaintiffs, the Court concludes there is a genuine issue of material fact rendering summary judgment inappropriate.

LMRA breach of contract cases are "governed by '[m]any of the basic principles of

8

contractual interpretation,' including the principle that 'the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Anderson*, 147 F.3d at 475 (citing *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983)). As stated above, and as recognized by Plaintiffs, the 2004 Agreement intended to cover the Plaintiffs by indicating that the UAW "on behalf of its current and *former members* that were *at any time* employed as hourly employees by Rouge Steel Company . . ." [2004 Agreement, Def.'s Mot. for Summ. J., Ex. N] (emphasis added). The 2004 Agreement specifically references Letter No. 9 and concludes that it "will have no further force or effect as to any rights of the Rouge Steel Workforce against Ford and that no employment actions of Severstal will trigger any obligations of Ford to the Rouge Steel Workforce under Letter No. 9." [*Id.*] In lieu of the rights afforded under Letter No. 9, the 2004 Agreement similarly provided an opportunity for employees of Severstal to return to Ford if they satisfied certain eligibility criteria. The 2004 Agreement divides all of the Severstal employees into four classes (listed as Group I-V), based upon their eligibility for retirement and seniority level. In order to be eligible to exercise the return to Ford rights under the 2004 Agreement, the employee must fall within a set of classes (i.e. "an hourly rated employee represented by the UAW as of December 15, 1989"); and must make an irrevocable election for one of the three options provided in the 2004 Agreement. These options provided certain benefits to continue as Severstal employees during the acquisition period, but also provided the option to return to Ford. Attached to the 2004 Agreement, and referenced within it, "is a list of Rouge Steel Workforce employees who meet the eligibility criteria," on which Plaintiffs are not included. A plain reading of the 2004 Agreement indicates that the parties to this agreement intended to extinguish the rights conferred by Letter No. 9.

9

Despite the intention of the 2004 Agreement, the question remains whether the parties to the Agreement had the ability to bargain away the rights conferred by Letter No. 9, or whether Letter No. 9 created a permanent right that could not be bargained away. Relying predominately on *Anderson*, Plaintiffs assert that the rights provided under Letter No. 9 constitute a "status benefit," which vested as long as Plaintiffs maintained their status. As such, Plaintiffs posit that their rights either vested at the date of the acquisition, or the date on which they were arguably laid off. Therefore, Ford and the UAW's subsequent attempt to modify or extinguish such rights violated federal labor law.

In this Circuit, it is well-settled that "collective bargaining agreements should be construed to effectuate the intent of the parties as expressed through the terms of the agreement, including provisions entitling employees to benefits after they leave the jobs they held at the time the agreement was negotiated." *Anderson*, 147 F.3d at 474. "[P]arties to a collective bargaining agreement may agree to a provision conferring benefits that accrue during the period in which the agreement is effective, but are not actually paid until after the expiration of the agreement." *Id.* at 475. Further, parties may confer "status" benefits that outlast the employment of the beneficiaries' membership in the bargaining unit covered by the original collective bargaining unit. *See id.* at 475-6. It follows from these principles that, if so intended by the parties, the Letter No. 9 agreement could have conferred upon Plaintiffs a permanent right that could not later be bargained away.

Defendant cites *Cooper v. General Motors Corp.,* 651 F.2d 249 (5th Cir. 1981) as a "particularly instructive" case. However, *Cooper* was decided in the Fifth Circuit, prior to both *Anderson* and *Yard-Man*. While the court in *Cooper* found the Plaintiffs' seniority rights did not

10

exist separate from the collective bargaining agreement at issue, both *Anderson* and *Yard-Man* support the proposition that rights born from a collective bargaining agreement can outlast the actual agreement if the parties so intended. To determine the intent of the parties with respect to the rights conferred by Letter No. 9, the Court must not look to the 2004 Agreement, but to the actual language of Letter No. 9. "Unless ambiguous, a collective bargaining agreement is limited to the language contained in its four corners." *Trustees of B.A.C. Local 32 Ins. Fund v. Fantin Enterprises, Inc.*, 163 F.3d 965, 969 (6th Cir. 1998).

Letter No. 9 is not ambiguous, and clearly confers the following rights on individuals not covered by the 2004 Agreement: employees with sufficient seniority will be "afforded the opportunity at the time of layoff to exercise seniority at Ford Rouge area plants" and employees lacking sufficient seniority "will be eligible for placement opportunities at other Ford locations under the provisions of the Ford-UAW Collective Bargaining Agreement in effect at that time," for a period of time equal to the employee's seniority as of the sale date, or for ten years after the sale date, whichever is greater. Letter No. 9.

                        a.       Eligibility of Plaintiffs under Letter No. 9

Defendant maintains that, even if Letter No. 9 is still in effect, Plaintiffs could not exercise rights under Letter No. 9 because they must have been a member of the bargaining unit as of the date of the sale to take advantage of that agreement. The Court finds that the provision covering "*any* Marico Rouge Steel employee who has seniority as of the date of sale" unambiguously confers a benefit on a group, including Plaintiffs, without imposing any requirement of future union membership. Even presuming ambiguity exists in the language of Letter No. 9, Plaintiffs further provide excerpts from deposition testimony that would, at a

11

minimum, create a genuine issue of material fact undermining Defendant's contention that eligibility under Letter No. 9 was contingent on future union membership at the time of a layoff. *See, e.g.* Def. 30(b)(6) Dep. of Chuck Columbus at 112 (admitting that, if a layoff occurred as a result of the sale, Plaintiffs would be eligible to exercise their return rights to Ford).

                b.       Triggering of Letter No. 9

One triggering event that would have allowed Plaintiffs to exercise seniority rights under Letter No. 9 was a lay-off resulting from a sale of the company's assets. Letter No. 9. Indisputably, there was a sale of assets by Marico to Severstal in 2004. The parties disagree, however, as to whether Plaintiffs were ever "laid off" as contemplated by Letter No. 9. Defendant maintains that Plaintiffs were not laid off, and could not fulfill the mandatory condition precedent to trigger Ford's obligations under Letter No. 9. Defendant contends that, because Plaintiffs were separated from Marico and immediately employed by Severstal, Plaintiffs were never laid off. Plaintiffs proffer various exhibits, including emails, deposition testimony, memoranda, and a Bankruptcy Order, to support their argument that the parties at one point believed and acknowledged that a layoff had occurred and Letter No. 9 rights had been triggered. *See, e.g.,* Pls.' Resp. Br. in Opp'n to Def. Ford Motor Company's Mot. for Summ. J., Ex. P, Rouge Transition Team Open Items/Issues 3/22/04 (listing "Chuck to send Bonnie note confirming no objection to layoff" as the "next step" under the item "Decision on objection to layoff/closing classification."); *see also* Pls.' Resp. Br. in Opp'n to Def. Ford Motor Company's Mot. for Summ. J., Ex. O, Bankruptcy Agreement and Stipulation ¶ 3 (stipulation between UAW and Rouge that employees were "permanently laid off by the Debtors on January 30, 2004, rather than terminated . . ."). Viewing all evidence in the light most favorable to the non-moving party

and drawing all justifiable inferences in the non-movant's favor, Plaintiffs have demonstrated that a genuine issue of material fact exists as to whether Plaintiffs were laid off for the purposes of Letter No. 9. Accordingly, summary judgment on Plaintiffs' § 301 claim must be denied. Having already found that summary judgment is inappropriate with respect to the § 301 claim, the Court need not address the equitable arguments put forth by Plaintiffs.

### B. Section 510 of the Employee Retirement Income Security Act Claim

In their second count, Plaintiffs allege that Ford violated § 510 of ERISA, 29 U.S.C. § 1140, by wrongfully refusing to honor the promises of Letter No. 9, with the calculated purpose of preventing Plaintiffs from receiving potential pension and healthcare benefits. Alternatively, Defendant argues that: (1) Plaintiffs are unable to make a prima facie showing of interference under § 510 of ERISA; and (2) even if they were, Ford did not act with the intent of avoiding ERISA liability.

Section 510 of ERISA, in pertinent part, provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. "This provision of ERISA is 'aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 455 (6th Cir. 2003) (internal citation omitted). Claims arising from § 510 generally fall within one of two categories: (1) retaliation claims, where adverse action is taken because a participant availed himself of an ERISA right; and (2) interference claims, where an employer interferes with the

attainment of a right under ERISA. *Coomer v. Bethesda Hospital, Inc.*, 370 F.3d 499, 506 (6th Cir. 2004). In this action, Plaintiffs allege an interference violation.

In order to avoid summary judgment on a § 510 interference claim, "an employee must show that there was: (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Marks*, 342 F.3d at 455. Although not included in the prima facie case, the plaintiff must also show "a causal link between pension benefits and the adverse employment decision." *Pennington v. Western Atlas, Inc.*, 202 F.3d 902, 906 (6th Cir. 2000). Consistent with the above prima facie requirements, the plaintiff must "come forward with evidence from which a reasonable jury could find that the defendants' desire to avoid pension liability was a determining factor" in the adverse employment decision. *Id.; Petrus v. Lucent Technologies, Inc.*, 102 Fed. Appx. 969, 971 (6th Cir. 2004). A plaintiff need not show that a desire to avoid liability was the sole reason for the action, as long as Plaintiff can demonstrate that it was a "motivating factor." *See Gitlitz v. Compagnie Nationale Air Fr.*, 129 F.3d 554, 558-9 (11th Cir. 1997). If the plaintiff is able to satisfy the prima facie burden, the defendant can "rebut the presumption of impermissible action raised by the prima facie case by introducing 'evidence of a legitimate, nondiscriminatory reason for its challenged action." *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). If the defendant so demonstrates, the burden again returns to the plaintiff who must show that the defendant's proffered reason was mere pretext or unworthy of credence. *Id.* In sum, to establish their claims, Plaintiffs must establish a breach of Letter No. 9 for the purpose of interfering with pension rights.

Having already found a genuine issue of material fact as to whether Plaintiffs are entitled

14

to benefits conferred by Letter No. 9, the same facts exist to render summary judgment in favor of Defendant inappropriate on whether there was a breach of Letter No. 9 constituting prohibited employer conduct, in satisfaction of the first and third elements of a prima facie case under § 510.  With respect to the second element, Plaintiffs have produced deposition testimony and draft memoranda, among other documents, that when viewed in the light most favorable to the Plaintiff, tend to demonstrate that Ford's denial of rights under Letter No. 9 was at least partially motivated by a desire to interfere with rights to which Plaintiffs may have become entitled.  *See, e.g.,* Pls.' Resp. Br. in Opp'n to Def. Ford Motor Company's Mot. for Summ. J., Ex. M, Mem. of Marty Mulloy (stating that minimizing the number of employees returning to Ford would "avoid the extension of post-retirement health care beyond the group of employees for which [Ford] already [has] that obligation.").  Plaintiffs also point to deposition testimony and Defendant's own internal documents to demonstrate Ford's concern with acquisition costs and a preference for limiting the number of employees who exercise return to Ford rights.  *See, e.g.,* Pls.' Resp. Br. in Opp'n to Def. Ford Motor Company's Mot. for Summ. J., Ex. II, Dep. of Jeffrey Copeland at 18 (Q: "Is it your memory, sir, that Ford had a financial interest in 2004 in trying to reduce the number of employees who would return to Ford from Rouge Steel?  A: Yes.").  At a minimum, this evidence creates a genuine issue of material fact sufficient to survive summary judgment on the issue of whether Ford's "legitimate nondiscriminatory reason" for breaching Letter No. 9 was mere pretext.  Accordingly, summary judgment on Plaintiffs' § 501 claim is inappropriate.

**V.    CONCLUSION**

For the reasons set forth above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment **[Docket No. 105,**

**filed Oct. 24, 2008]** is **DENIED**.

   **IT IS FURTHER ORDERED** that a Status Conference is set for November 16, 2009 at 4:30 p.m.

             S/Denise Page Hood
             Denise Page Hood
             United States District Judge

Dated:  October 13, 2009

   I hereby certify that a copy of the foregoing document was served upon counsel of record on October 13, 2009, by electronic and/or ordinary mail.

             S/William F. Lewis
             Case Manager