# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DAVID JOSEPH, ROBERT MACIASZ,
ANTHONY MANDERACHIA, DENNIS
SZOKOLA, EDWARD TUTTLE, WILLIE
E. WORTHEN,

      Plaintiffs,

v.

FORD MOTOR COMPANY,

      Defendant.
_____/

Civil Action No. 06-10274

Honorable Denise Page Hood

## FINDINGS OF FACT AND CONCLUSION OF LAW

**I.  INTRODUCTION**

Plaintiffs David Joseph, Robert Maciasz, Anthony Manderachia, Dennis Szokola, Edward Tuttle and Willie E. Worthen are former employees of Defendant Ford Motor Company (Ford). All were employed at the Ford Rouge Steel facility from approximately 1971 until 1989. The Plaintiffs were hourly employees and were union members represented by the United Auto Workers Local 600 (UAW). The Plaintiffs' employment was governed by a collective bargaining agreement between the UAW and Ford. In November 1989, the Rouge Steel facility was sold by Ford to Marico Acquisition Group and became Marico Rouge Steel Company. Ford, the UAW and Marico entered into a Settlement Agreement on November 29, 1989 that addressed employee issues involved in the transition of ownership from Ford to Marico. This Settlement Agreement included a document referred to as Letter No. 9. Plaintiffs claim that Ford breached the agreement of Letter No. 9 as it relates to them and that such breach violates Section 301 of the Labor Management Relations Act

(LMRA), 29 U.S.C. § 185 (Count I) and Section 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1140 (Count II). Plaintiffs claim that Ford, by failing to honor their rights under Letter No. 9, intended to prevent Plaintiffs from becoming eligible for certain ERISA benefit plans, including health benefits, pension benefits and other retirement benefits to which they were entitled under Letter No. 9.

In an opinion denying Ford's Motion for Summary Judgment, this Court found that viewing the facts in the light most favorable to the non-moving parties, the Plaintiffs, Letter No. 9 embraced Plaintiffs as third-party beneficiaries. (Doc. No. 183) The Court noted that there remained "considerable" debate as to whether the Plaintiffs fall within the class of employees who are eligible to return to Ford as third party beneficiaries under Letter No. 9. The Court also found that there was a genuine issue of material fact as to whether future union membership at the time of a layoff was a criteria for rights (specifically the right to return to Ford) under Letter No. 9. The Court further found that Plaintiffs had raised a genuine issue of material fact as to whether Plaintiffs were laid off for the purposes of Letter No. 9. With respect to the Section 510 claims, the Court found that the same facts rendered summary judgment inappropriate on whether there was a breach of Letter No. 9, noting that there was at least a genuine issue of material fact as to whether Ford's legitimate non-discriminatory reason for breaching Letter No. 9 was mere pretext.

The parties proceeded to a bench trial. The Court now, in accordance with Rule 52(a) of the Rules of Civil Procedure, renders the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

Plaintiffs were employed by Ford at the Rouge Steel facility from 1971 until 1989. They were hourly workers represented by the UAW Local 600 and subject to a collective bargaining

agreement. Ford sold the Rouge Steel facility to Marico on November 28, 1989. A Settlement Agreement governed the sale and transition of Rouge Steel from Ford to Marico. Under the Settlement Agreement, hourly employees had certain options relative to their employment. Employees could: 1) retire; 2) remain at Ford by exercising their seniority rights; or, 3) remain at Rouge employed by Marico and receive benefits outlined in the Rouge Steel Retention Payment Program.

Attachment No. 9 to the Ford-UAW Settlement Agreement, known as Letter No. 9, reads in pertinent part as follows:

> Ford Motor Company is willing to allow any Marico Rouge Steel employee who has seniority as of the date of sale and who may be laid-off in the future as a result of a layoff of unknown duration, a permanent discontinuance of an operation at Marico Rouge Steel or a sale of the assets of the company, will be afforded the opportunity at the time of layoff to exercise seniority at Ford Rouge area plants. Employees who do not have sufficient seniority to exercise in other Rouge locations, and/or no available openings exist at Rouge locations, will be eligible for placement opportunities at other Ford locations under the provisions of the Ford-UAW Collective Bargaining Agreement in effect at that time. This opportunity will remain in effect for an employee for a period of time equal to his Ford seniority as of the date of the sale, or for a ten-year period following the date of sale, whichever is greater.

(Trial Ex. A) Letter No. 9 was designed to address the long term security of the Rouge Steel workforce and to provide job protection in the event of a layoff.

Employees who became part of Marico Rouge Steel fell into generally three categories with respect to benefits offered. Group I included employees who were eligible for retirement in 1989. Their pension rights remained with the Ford pension plans. Group II included those employees whose combined seniority and age was 60 or more; their pensions also stayed with the Ford pension plans. Health care and retirement health care benefits for Groups I and II were tied to the Ford pension plans. Group III were employees with less than the 60 points whose funding and pension

liability was transferred to the new Rouge Steel owner. Ford did not accept any ongoing pension or retirement health care responsibility for the employees in Group III. Plaintiffs were all in Group III as hourly employees at the time of the transfer to Marico; their pension credits were transferred from Ford to Marico Rouge Steel. According to Bernard Ricke, President of UAW Local 600, and Lee Mezza, Ford's Director of Benefits, none of the service at Ford or Marico would have been transferred back to Ford for the purpose of Ford pension eligibility had Plaintiffs at some point returned to Ford. Each would have had to begin earning pension credits as a new employee.

During the course of their employment at Marico Rouge Plaintiffs voluntarily accepted salaried positions. These positions were "at will" positions. Each Plaintiff signed an employment application recognizing that the status of the new position was "at will" subject to termination at any time with or without cause or advance notice by the employee or the employer. (Trial Ex. 110, A51) As salaried employees Plaintiffs' health benefits and pension plans were different than those of hourly employees and not covered by any collective bargaining agreement. Such benefits could be diminished at the pleasure of the employer. These benefits had nothing to do with Ford or the UAW.

In October 2003, Marico Rouge Steel declared bankruptcy. Marico Rouge Steel was at the time a primary source of steel for Ford. Ford was concerned about its steel supply from Marico Rouge Steel. Ford was one of the largest creditors of Marico Rouge Steel and therefore a party to the bankruptcy. (Trial Ex. 85) Ford was also concerned about how the potential closure of Marico Rouge Steel would impact its labor force. If Marico Rouge Steel closed hourly employees could be laid off. Some of these hourly employee would then be in a position to return to Ford under Letter No. 9. These employees could potentially "bump" other employees and start a process of employees exercising seniority to bump other employees with less seniority. This process Ford called

4

"churning" which some at Ford estimated might have resulted in over 2,000 employee changes within the company. This "bumping" had other impacts on Ford as well, including placing of employees with little or no training in areas where other employees had already been trained, especially in areas where new products were planned to be launched. In addition, Ford was preparing for national bargaining with the UAW and did not want Rouge Steel to fail during the negotiations.

Retaining the employees based at Rouge Steel was also important to attract potential buyers for the operation. Ford was interested in designing a way for employees at Rouge Steel to stay in their positions retaining Rouge Steel with a trained workforce in a safe environment. Ford was working with the UAW on these issues.

During the course of Marico's bankruptcy, Marico was allowed to sell Rouge Steel under an Asset Purchase Agreement to Severstal North America, a parent company of Severstal Dearborn. Severstal would only agree to the sale if a mutually agreeable labor agreement was negotiated with the UAW. Ford and the UAW entered into a Memorandum of Agreement (MOA) on February 23, 2004, regarding the workforce at Rouge Steel. The MOA provided in part:

> The Parties have decided it is in their mutual best interests to make certain opportunities available to the Rouge Steel Workforce who meet certain eligibility criteria and who under the terms of the Ford-UAW Letter No. 9 ... had return to Ford rights as of January 29, 2004 in an effort to resolve all issues between UAW and Ford arising from the interpretation and application of Letter No. 9 as a result of the bankruptcy of Rouge ... The Parties also agree that Letter No. 9 will have no further force and effect as to any rights of the Rouge Steel Workforce against Ford and that no employment actions of Severstal will trigger any obligations of Ford to the Rouge Steel Workforce under Letter No. 9.

(Trial Ex. 9)

5

Employees of Marico ceased employment with that company on January 29, 2004. Some employees returned to Ford under the MOA, others became employees of Severstal. Each of the Plaintiffs in this case accepted at-will employment as salaried employees with Severstal. All signed offers of employment. They accepted new terms of at-will employment and new benefits packages. Plaintiffs would be required to work for Severstal for five years to become eligible for certain retirement health care benefits. (Trial Ex. 132, FP00157) None of the Plaintiffs missed any days of work; the turnover to Severstal was seamless.

Under the MOA, former Ford UAW employees who met certain criteria were allowed to return to Ford, even though Ford maintained Letter No. 9 was not triggered. In the MOA, the parties, Ford and the UAW also agreed that Letter No. 9 would have no further force or effect and that the employment actions of Severstal would not trigger any obligations under Letter No. 9 related to the Rouge Steel workforce. (Trial Ex. K)

Although the Plaintiffs argue that the issue of salaried employees remained an open issue after the 2004 MOA, they present no evidence that supports an interpretation other than the MOA was intended to replace Letter No. 9 and extinguish the rights of the Rouge workforce under Letter No. 9 as to Severstal. While it appears that the individual in charge of salaried issues for Ford, Richard Gross, did not consult with anyone involved in the negotiations of Letter No. 9 as to whether Letter No. 9 applied to salaried employees, there is no provision in Letter No. 9 nor in the MOA which requires consultation by Ford on this issue. There is some evidence that Ford categorized the Rouge Steel employees, including those who had become salaried employees at Marico. Although denied by Ford, there is also some evidence that Ford considered whether Letter No. 9 applied to salaried employees even though these employees were no longer union members.

(Trial Ex. 13) Ford commissioned reports assessing the cost of Ford as to Rough Steel employees. (Trial Exs. 29, 74 and 77)

During the Marico bankruptcy proceedings, on February 11, 2004, Jerome Catalano emailed Joe Laymon at Ford concerning the rights of 75 Rouge Steel salaried employees. (Trial Ex. 72) Catalano sought a response as to Ford's position concerning the salaried employees' return status to Ford. In his email, Catalano referred to the salaried employees' "return status" under the "1989 Marico Agreement." (Trial Ex. 72) The Catalano email was forwarded for a response to Martin Mulloy, the Executive Director for Ford Labor Affairs. In a letter dated March 3, 2004, Mulloy responded that he was not clear as to what "legal rights" were referred to in Catalano's email and how these rights may apply to the 75 unnamed individuals mentioned in the email. (Trial Ex. 71) Mulloy invited further clarification with further specific details.

In a letter dated May 13, 2005, the six Plaintiffs in this case, wrote Richard Gross, Manager of Personnel Relations at Ford, explaining their reasons for believing their rights under Letter No. 9 allowed them to return to Ford. (Trial Ex. 52) Plaintiffs sought to exercise their rights under Letter No. 9, but Plaintiffs claim Ford did not respond to their letter. This action followed to enforce Plaintiffs' rights under Letter No. 9.

### III. CONCLUSIONS OF LAW

#### A. Section 301 Violation

Plaintiffs claim a breach of contract under Section 301 of the LMRA, 29 U.S.C. §185. Under Section 301, individual beneficiaries have a right to bring a breach of contract claim for breach of a collective bargaining agreement or any other agreement covered by §301. Such actions may be brought by individual union members or by persons who have a beneficial interest in the

7

enforcement of a given agreement. Plaintiffs claim they are third-party beneficiaries entitled to enforce their rights under Letter No. 9 to return to Ford. Ford claims these salaried employees have no rights to assert under Letter No. 9 and if they did the obligations under Letter No. 9 were never triggered.

In order to establish a Section 301 violation, the Plaintiffs must prove: (1) that there was a valid contract, that Letter No. 9 was a valid contract; (2) that Ford breached Letter No. 9; and (3) that Plaintiffs suffered damages as a result of the breach. *Burkholder v. International Union, United Automobile, Aerospace and Agricultural Workers of America*, 299 Fed. Appx. 531, 537 (6th Cir. 2008); *Frederick v. Federal Mogul, Inc.*, No. 06-11549-BC, 2008 U.S. Dist. LEXIS 101620 (E.D. Mich. Dec. 12, 2008)

It is undisputed that Letter No. 9 was a valid contract negotiated in 1989 between Ford and the UAW under the Marico Agreement. Ford, however, argues that Letter No. 9 was no longer a valid contract after the negotiation of the MOA in 2004. It is clear that the intent of the parties to the MOA was that Letter No. 9 no longer had any effect as to any employee. Nonetheless, several questions arise about the validity and application of Letter No. 9 in this case, in light of Plaintiffs' position that as salaried employees, they were not represented by the UAW during the 2004 MOA negotiations.

The first question is whether the rights under Letter No. 9 were permanent or whether the letter could be and was terminated by subsequent negotiations. This Court previously found that a plain reading of the 2004 MOA indicates that all the rights under Letter No. 9 were extinguished by the MOA as to both current union members and "former members that were at any time employed as hourly employees by Rouge Steel Company." (Trial Ex. N).

Plaintiffs contend that Letter No. 9 created rights that could not be bargained away and are permanent rights. Even within Letter No. 9 the rights created thereunder are limited. The exercise of the right to return to Ford under Letter No. 9 is limited in time to a period of ten years or the length of the employee's seniority as of the date of sale to Marico. (Trial Ex. A). Specifically, Letter No. 9 states that the opportunity to exercise the right to return, "will remain in effect for an employee for a period of time equal to his Ford seniority as of the date of the sale, or for a ten-year period following the date of sale, whichever is greater." (Trial Ex. A) However, other than that limitation, there appears to be no evidence supporting any other interpretation of Letter No. 9. The limitation is a durational limitation applicable to a specific benefit, that being the right to exercise seniority at Ford created under Letter No. 9. The parties never intended this opportunity to be a permanent benefit that could not later be bargained away. Even if the rights under Letter No. 9 were treated as seniority rights, such rights were not vested and can be the subject of bargaining. *See Ingersoll v. Brotherhood of Locomotive Engineers*, 307 F.2d 257, 261 (6th Cir. 1962); *McCormick v. Aircraft Mechs. Fraternal /Association*, 340 F.3d 642, 646 (6th Cir. 2003). The ability to bargain away these rights applies to both current union employees and former union employees. *Cooper v. Gen. Motors. Corp.*, 651 F.2d 249 (5th Cir. 1981); *Int'l Union v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 n. 8 (6th Cir. 1983).

The Court, however, must determine whether the Plaintiffs, no longer union members, continue to have any rights under Letter No. 9. Because the language of Letter No. 9 covers, "any Marico Rouge Steel employees who has seniority as of the date of the sale" it appears that there is no requirement of future union membership to exercise the benefits of Letter No. 9, if any rights can be found to be permanent or to have vested. Under *Yardman* and federal law cited above regarding

the ability to bargain away such rights, Plaintiffs had no vested or permanent rights to exercise seniority under Letter No. 9 after the negotiation of the MOA which extinguished the rights under Letter No. 9.

Here it must be noted that Ford nor Severstal management employees interpreted Letter No. 9 as applicable to salaried employees. William Hornberger, at the time Vice President of Employee Relations for Rouge Steel, noted that salaried employees at Ford had "company service" as opposed to "seniority." (Hornberger Dep. at 10) He testified that in 1989, the salaried employees, as opposed to the hourly UAW represented employees who had "bump rights," only had "preferential placement consideration rights." (Hornberger Dep. at 27; 72-74). Ford was convinced to give "consideration" to salaried employees during the purchase of Rouge Steel by Marico, in some ways similar to that given UAW represented employees because when Marico acquired Rouge Steel it did not want disenchanted salaried people. (Hornberger Dep. at 44) This meant that if salaried employees could find a job at Ford within a certain window of time, they would be allowed to move back to Ford. (Hornberger Dep. at 27) Sixteen (of 275) salaried employees returned to Ford in 1989 and the remaining salaried employees were given retention payments. (Hornberger Dep. at 44)

Hornberger further testified that such a "consideration" was investigated in the sale of Rouge Steel to Severstal in 2004, but not pursued. (Hornberger Dep. at 44) Hornberger was the Senior Vice President of Employee Relations and Public Affairs for Marico Rouge Steel at the time Severstal acquired the assets of Rouge Steel in bankruptcy. (Hornberger Dep. at 5) Marlene Bankwitz, Marico Rouge Steel Human Resources Associate in 2003, testified at trial that she was not looking at whether Letter No. 9 would be triggered as to salaried employees, but whether Ford would give some consideration for salaried employees to return to Ford. (Bankwitz Trial

10

Testimony) Bankwitz testified that Marico Rouge Steel salaried employees had no rights, other than vacation replacement, to return to hourly employee status. (Bankwitz Trial Testimony) At no time was Letter No. 9 interpreted by Ford, Marico Rouge Steel or Severstal to be applicable to salaried employees. (Hornberger Dep. at 44, 46; Bankwitz Trial Testimony; Mulloy Trial Testimony) All Ford, former Ford Rouge Steel and now Severstal management employees testified that Letter No. 9 was not applicable to salaried employees.

Even if Letter No. 9 had vested or created permanent rights that Plaintiffs could exercise, those rights could only be exercised in the event of a layoff resulting from the sale of the company or its assets. The parties disagree as to whether a layoff occurred when Marico sold Rouge Steel to Severstal. Ford contends that Plaintiffs were never laid off because they were separated from Marico and were immediately employed by Severstal with no break in service. Ford's definition of layoff refers to situations where an employee is out of work and that employee is eligible to receive certain unemployment benefits. In its Opinion denying summary judgment, the Court determined the question was whether the term "layoff" in Letter No. 9 was intended to have its broad meaning, separation of employment from Rouge Steel or its narrow meaning, a layoff as a result of the sale of the company's assets or a temporary period of idleness accompanied by state unemployment benefits and an opportunity for recall. The broad definition was advanced by the Plaintiffs, the narrow definition by Ford.

Letter No. 9 speaks to layoff in the context of an employee, "... who may be *laid-off* in the future as a result of a layoff of unknown duration, a permanent discontinuance of an operation at Marico Rouge Steel or a sale of assets of the company, will be afforded an opportunity at the time of the layoff to exercise seniority at Ford Rouge area plants." (Trial Ex. A) No evidence supports

11

an interpretation of the transition of Marico Rouge Steel to Severstal as a layoff because the break was not "a result of a layoff of unknown duration." In the case of these Plaintiffs, there was no such layoff. Nor was there "a permanent discontinuance of an operation at Marico Rouge Steel," as there was not a shutdown or a ceasing of the operation of the work of the facility. There was a "sale of the assets" of Marico to Severstal under the bankruptcy proceedings. Ford, Marico Rouge Steel and Severstal management employees described a "lay-off" as a temporary disruption of employment. (Ivey Trial Testimony; Baggett Trial Testimony)

As to the "sale of assets" language, such provision of Letter No. 9 must be read in context of the language, "who may be *laid-off* in the future *as a result of ... a sale of the assets* ..." (Trial Ex. A) Here, there is no layoff. No Plaintiff suffered a break in service of any kind. Each Plaintiff testified that they went home on January 29, 2004 a Marico Rouge Steel employee and came back to work the next day to a company then owned by Severstal without any break in service, without any loss of actual pay, without any need to collect unemployment benefits.

Plaintiff Maciasz went into work on January 29, 2004 and worked as usual even though he did not "sign" with Severstal until February 6, 2004. Plaintiff Szokola accepted employment at Severstal on February 4, 2004. Szokola claimed at trial that he was terminated and laid off simultaneously, from Rouge Steel. At his deposition he claimed he had been terminated. At trial, he claimed there is no difference between termination and lay off.

Plaintiff Joseph also testified that he suffered no break in service. He came to work on January 29, 2004 as usual but believed he had been permanently laid off because the company, Marico, ceased to exist. Previously he had also testified that he was terminated. However, there was no break in his employment. He was presented with an offer of employment dated January 30, 2004.

12

Plaintiff Manderachia testified that he was terminated from Rouge Steel on January 29, 2004, even though he continued working thereafter. Plaintiff Tuttle testified that on January 29, 2004, he was employed at Rouge Steel, but the employment ended that day since the company ceased to exist. Plaintiff Tuttle was directed to come to work the next day. He accepted a job at Severstal with the paperwork signed on February 6, 2004. Plaintiff Worthen testified that his job at Rouge Steel ceased to exist on January 29, 2004, that he accepted a position at Severstal, and continues to receive retirement healthcare benefits from Severstal.

None of the Plaintiffs suffered a "layoff" as contemplated by Letter No. 9 despite their understandings of how the phrase was used in Letter No. 9. Plaintiffs point to no evidence at the time Letter No. 9 was negotiated that defined "layoff" without any break in service. The UAW did not consider the employees "laid off" under Letter No. 9 during its negotiations regarding the purchase of Marico Rouge Steel by Severstal. (Columbus Trial Testimony) The term "layoff", based on experiences by UAW members, include time when the employees were not working. Ricke testified that if hourly employees were laid off, they would be entitled to certain benefits under the CBA, such as supplemental pay upon layoff or unemployment pay. (Ricke Trial Testimony) When Rouge Steel was sold to Severstal, no employee received such benefits and the UAW did not file a grievance claiming that its members were entitled to layoff benefits. Plaintiffs signed "at will" employment letters with Severstal. There was no layoff of employees when Marico sold Rough Steel to Severstal. Plaintiffs continued to work, their salaries remained the same, and they were paid even for the days between when they were unsure about who they worked for through the day they signed the new employment contracts with Severstal.

Plaintiffs argue that Ford's internal documents support their argument that Letter No. 9 was

triggered, citing particularly Charles Columbus' planning calendar notation, "Meet obligations of 1989 letter: eligible laid-off employees exercise seniority at Ford Rouge area plants." But Plaintiffs were not laid off and Letter No. 9 was not triggered with respect to their employment. Plaintiffs' argument that Ford acknowledged that Letter No. 9 was triggered in the February 23, 2004 MOA with the UAW is without merit as it relates to their uninterrupted employment. Nor does the fact that Ford was involved in the bankruptcy proceedings of Rouge Steel trigger Letter No. 9 for these Plaintiffs. As a creditor during the Marico Rouge Steel bankruptcy action, Ford did not take a position as to any legal issue relating to the employees at the time the sale took place between Marico and Severstal. Only the UAW and Marico Rouge Steel entered into such a stipulation and the stipulation did not identify whether Letter No. 9 was incorporated into the stipulation. (Trial Ex. 85)

Marico Rouge Steel and the UAW took the position in the bankruptcy that it was a layoff for the purpose of pension credit and benefits. Michelle Ivey, Supervisor of Compensation and Benefits at Rouge Steel testified that when employees started applying for Rouge Steel pension benefits after the sale to Severstal, she gave hourly employees "layoff credit" under the retirement plan's provisions. (Ivey Trial Testimony) This resulted from a disagreement between the UAW and the Pension Benefit Guaranty Corporation about the Rouge pensions, according to Melvin Baggett, Vice President of Human Resources at Severstal and former Director of Human Resources at Marico Rouge Steel.

There is little dispute that Ford had an interest in Severstal maintaining the Rouge Steel facility as a steel supplier to Ford. Ensuring Severstal would stay committed to the purchase through the retention of employees with critical skills was of benefit to Ford. The potential closure of Rouge

14

Steel had raised other concerns at Ford such as "churning," the reintegration of returning workers into its other work forces at a time of the launch of critical new products. There was a safety benefit to Severstal's retention of employees already skilled in their jobs and an influx of skilled tradesmen would have added excess in other Ford facilities. And there was also the concern of the extension of the cost of post-retirement health care.

In the midst of all these issues, there was attention and investigation into whether it was feasible to give some "consideration" to salaried employees; allowing them to return to Ford, even though they were, according to Ford and the UAW, no longer covered by Letter No. 9 and no longer represented by the union, even though Letter No. 9 had not been triggered by a layoff as far as the salaried employees were concerned. In fact, the hourly employees were not considered laid off except in so far as necessary to provide the best pension benefit situation for them.

Because the Court finds Plaintiffs were not "laid-off" when Severstal purchased the Rouge Steel asset from Marico, Letter No. 9 was not triggered. Plaintiffs are not entitled to any rights under Letter No. 9. Plaintiffs have not carried their burden to show that Ford breached Letter No. 9.

### B. Section 510 Violation

Plaintiffs also allege a violation of Section 510 of ERISA, 29 U.S.C. §1140. Plaintiffs claim that Ford wrongfully refused to honor Letter No. 9 for "the calculated purpose of preventing Plaintiffs from receiving certain pension and healthcare benefits." In order to establish a *prima facie* claim under Section 510, three elements must be established: 1) a prohibited employer conduct; 2) taken for the purpose of interfering; 3) with the attainment of any right to which the employee may be entitled. *Pennington v. Western Atlas,* 202 F.3d 902, 906 (6th Cir. 2000). Here, Plaintiffs must

15

show that Ford breached Letter No. 9 for the purpose of interfering with pension rights to which Plaintiffs may become entitled. Plaintiffs must present evidence to show that Ford's desire to avoid pension liability was a determining factor in this adverse employment decision. Once Plaintiffs have a established a *prima facie* case, Ford must then present "evidence of a legitimate non discriminatory reason for its challenged action." *Id.; Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). Plaintiffs then have the burden to show that Ford's proffered reason was pretext. Plaintiffs do not have to show that Ford's sole purpose was to interfere with the Plaintiffs' entitlement to benefits; Plaintiffs must prove that such interference was a "motivating factor" in Ford's actions or that Ford's proffered reason is "unworthy of credence." *Id.*

The evidence presented at trial does not support a showing that Ford interfered with Plaintiffs' pension rights. Initially the Court notes its finding that no "layoff" occurred to trigger rights for these Plaintiffs under Letter No. 9. Secondly, Letter No. 9 confers no pension rights on these employees. Letter No. 9, as previously stated, allows certain employees, under certain conditions, to "exercise seniority at Ford Rouge area plants" and "at other Ford locations" under the collective bargaining agreement between Ford and the UAW at the time of such exercise. Letter No. 9 includes a time period in which such an exercise can occur: "a period of time equal to his Ford seniority as of the date of the sale, or for a ten year period following the date of sale, whichever is greater." The Letter then reads:

> Upon return to Ford Motor Company under the provisions of this understanding an employee shall be reinstated with the same seniority date held at the time of the sale. It is understood that benefit entitlements will be determined by the individual benefit plans.

(Trial Ex. A) No particular pension or other benefits are specifically noted.

Hornberger testified that in 1989, only sixteen of 275 salaried employees at Rouge Steel

16

elected to return to Ford. Hornberger testified that in 2003-2004, he requested that this "consideration" be extended again to Marico Rouge Steel salaried employees "to provide salaried employees something to which we didn't believe theat they were eligible but thought that they might be willing to consider some comparable treatment to what was ultimately negotiated for hourly employees. Basically, we were trying to be an advocate for our people." (Hornberger Dep. at 44) Ford's response was "no." (Hornberger Dep. at 44) Also, Bankwitz testified that she prepared lists of Marico Rouge Steel employees who may or may not have recall rights and seniority rights in preparation of the Rouge Steel purchase by Severstal. (Trial Exhibit 83-A and Exhibits Charts 9 and 13) Bankwitz stated that these exhibits were not created to determine what would happen if Letter No. 9 were triggered, but were generated to see what would happen if Ford gave the same consideration to salaried employees as Ford was going to give to hourly employees. (Bankwitz Trial Testimony)

Because the Court finds that Letter No. 9 was not triggered, Plaintiffs are unable to show that Ford breached Letter No. 9 for the purpose of interfering with Plaintiffs' pension rights. Plaintiffs have not carried their burden in showing that Ford interfered with Plaintiffs' pension rights under Section 510.

For the reasons set forth above, the Court finds a no cause of action against Plaintiffs and finds in favor of Ford.

IT IS SO ORDERED.

        S/Denise Page Hood
        Denise Page Hood
        United States District Judge

Dated: July 17, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 17, 2013, by electronic and/or ordinary mail.

        S/LaShawn R. Saulsberry
        Case Manager